DAVID P. COOPER, OSB No. 880637
Email: cooper@khpatent.com
OWEN W. DUKELOW, OSB No. 965318
Email: owen@khpatent.com
DESMOND J. KIDNEY, II, OSB No. 131558
Email: desmond@khpatent.com
KOLISCH HARTWELL, P.C.
520 S.W. Yamhill Street, Suite 200
Portland, Oregon   97204
Telephone: (503) 224-6655
Facsimile: (503) 295-6679

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| GOOD CLEAN LOVE, INC., an Oregon corporation,<br><br>                     Plaintiff,<br><br>      v.<br><br>AURIUM PHARMA INC., an Ontario, Canada corporation, ROWLAND GLOBAL LLC, a New Jersey limited liability company, and EDWARD ROWLAND, an individual,<br><br>                 Defendants. | Case No. 6:17-cv-01712<br><br>COMPLAINT FOR FEDERAL TRADEMARK INFRINGEMENT AND FALSE DESIGNATION OF ORIGIN, AND OREGON BREACH OF CONTRACT, INTENTIONAL INTERFERENCE WITH ECONOMIC RELATIONS, UNLAWFUL BUSINESS AND TRADE PRACTICES, BREACH OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, AND PROFESSIONAL NEGLIGENCE<br><br>DEMAND FOR JURY TRIAL |

## COMPLAINT

Plaintiff, Good Clean Love, Inc. ("Plaintiff" or "Good Clean Love"), for its Complaint against Aurium Pharma Inc. ("Aurium"), Rowland Global LLC ("Rowland Global"), and Edward Rowland (referred to collectively with Rowland Global as "Rowland") (collectively, Aurium, Rowland Global and Rowland are referred to as "Defendants"), states as follows:

## INTRODUCTION

1.      Good Clean Love brings this action because Defendants have conspired to sabotage Good Clean Love's distribution in Canada, and then to use Good Clean Love's proprietary, confidential business information and intellectual property to launch a brand of products nearly identical to those marketed and sold by Good Clean Love.

2.      Good Clean Love hired Rowland based on its promise to expand worldwide distribution for Good Clean Love's products.  Rowland emphasized its extensive network of distribution contacts and experience in distribution, regulatory, and strategic acquisition matters.  Rowland proceeded to introduce Good Clean Love to Defendant Aurium, a distributor of consumer products, and guided Good Clean Love into entering an agreement with Aurium to serve as Good Clean Love's exclusive distributor in Canada (the "Distribution Agreement").  Those products included Good Clean Love's successful RESTORE brand of moisturizing personal lubricant.

3.      Rowland represented to Good Clean Love that he would be a "relentless" advocate for his client in negotiations with Aurium, but the truth was that Rowland was at all times more concerned with developing good will and favor with Aurium.  The Aurium agreement that Rowland negotiation was a detrimental deal for Good Clean Love.  Aurium never reached its sales targets or satisfied its obligations under the agreement, and Rowland later pressured Good Clean Love into taking on additional costs that made the deal worthless.

4.      Even worse, the Aurium deal, Rowland represented to Good Clean Love that he would guide the company in negotiations with a potential strategic acquirer, however, Rowland's negligent advice and self-interest interfered with Good Clean Love's acquisition by a larger consumer products company that could have been worth tens of millions of dollars for Good Clean Love.  Left without a strategic acquirer and a worthless distribution deal, Good Clean Love terminated Rowland after six months of negligent service, and later terminated the Aurium distribution deal.

5.      During and after Good Clean Love's consulting relationship with Rowland, Rowland communicated and shared Good Clean Love's confidential information with Aurium without disclosure or approval. and in violation of the non-disclosure agreement that was entered into by Rowland and Good Clean Love.  Immediately after Good Clean Love terminated the Aurium agreement, Aurium proceeded to use Good Clean Love's proprietary, confidential information, including information obtained through its relationship with Rowland, to market and sell nearly identical products, brazenly using elements of Good Clean Love's trademarks.  In particular, Aurium launched a new RESTORE brand of moisturizing personal lubricant, targeted to the same consumers as Good Clean Love's RESTORE brand of moisturizing personal lubricant, in clear violation of the non-compete and intellectual property provisions of the Distribution Agreement.

6.      Defendants' conduct caused Good Clean Love substantial harm in its business in Canada, the United States, and other markets.  Good Clean Love brings this action for damages and injunctive relief against (1) Defendant Aurium for federal trademark, infringement, breach of contract, intentional interference with economic relations, unlawful business and trade practices, and breach of good faith and fair dealing, and (2) the Rowland Defendants for breach of fiduciary duty, professional negligence, and intentional interference with economic relations.

## THE PARTIES

7.    Plaintiff Good Clean Love, Inc. is an Oregon corporation having its principal place of business at 207 W. 5th Avenue, Eugene, Oregon 97401.

8.    Good Clean Love manufactures and markets natural and organic intimacy and feminine hygiene products.  Among its best-selling products, Good Clean Love sells moisturizing personal lubricant products under popular brand names such as RESTORE, ALMOST NAKED and GUILTY PLEASURE.

9.    Defendant Aurium is a Canadian (Ontario) corporation, having its principal place of business at 105-7941 Jane St, Concord, Ontario, L4K 4L6 Canada.

10.    Aurium is a distributor that markets a wide range of consumer products both in Canada and the United States.

11.    Aurium marketed Good Clean Love's RESTORE brand of moisturizing personal lubricants, and now markets a line of moisturizing personal lubricants under its own RESTORE brand that is directed to the same consumers as Good Clean Love's RESTORE brand.

12.    Defendant Rowland Global LLC is a New Jersey limited liability company, owned and controlled by Defendant Edward Rowland, operated as a product broker/agent for others' products. Rowland Global's business address is 55 Madison Ave., Suite 400, Morristown, NJ 07960.

13.    Defendant Edward Rowland is a product broker/agent with a business address of 55 Madison Ave., Suite 400, Morristown, NJ 07960.

## JURISDICTION AND VENUE

14.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1338 because there are Federal questions arising under the trademark laws of the United States.

15.    The Court has personal jurisdiction over all Defendants.

16.    Defendant Aurium conducts business in Oregon, including by reaching into Oregon to enter into an exclusive Distribution Agreement with Good Clean Love, an Oregon company. Aurium also markets and sells in the United States including through its website. According to Aurium's website, Aurium offers to sell and ship the pHemme line of products, and RESTORE brand of lubricant, to all fifty States and the District of Columbia and Puerto Rico.

17.    Further, Aurium's exclusive Distribution Agreement with Good Clean Love, Section 18.9, provides for jurisdiction in Oregon:

> All disputes arising out of or in connection with this Agreement which cannot be settled amicably shall be referred to either the state or federal courts located in the State of Oregon, and the parties to this agreement irrevocably consent to the jurisdiction of the courts located in the State of Oregon.

A true and correct copy of the Distribution Agreement is attached as Exhibit C.

18.    Defendants Rowland Global and Edward Rowland conduct business in Oregon, including by reaching into Oregon to engage in consulting services for Good Clean Love, a company incorporated and operating in Oregon. Further, Rowland Global and Rowland repeatedly called, emailed and closely advised Good Clean Love's CEO at her location in Oregon, negotiated the exclusive Distribution Agreement with Aurium (containing the Oregon jurisdiction clause), and strongly recommended that Good Clean Love enter the exclusive Distribution Agreement with Aurium.

19.    Venue is proper in this Court under at least 28 U.S.C. § 1391(c) and Section 18.9 of the exclusive Distribution Agreement between Aurium and Good Clean Love.

20.    Pursuant to the Aurium Distribution Agreement Sections 18.8 and 18.9, Oregon law applies to all disputes arising out of or in connection with Good Clean Love's exclusive Distribution Agreement with Aurium.

# BACKGROUND

### A. Good Clean Love's Marketing and Sale of Lubricants and Associated Intellectual Property Rights

21.    Since at least 2005, Plaintiff Good Clean Love has invented, formulated, manufactured, and sold a line of all-natural, organic intimacy products, including personal lubricants (collectively, "Intimacy Products") in the United States, and now throughout the world.

22.    Good Clean Love markets its products under the GOOD CLEAN LOVE® trademark, and under distinctive sub-brands, such as its RESTORE™ brand of lubricants.

23.    Good Clean Love has developed packaging and artistic designs that consumers associate with Good Clean Love's high-quality, successful Intimacy Products.  As early as 2010, Good Clean Love adopted leaf artwork that it has consistently used in connection with its Good Clean Love branding on its packaging, website and marketing materials.

24.    Good Clean Love launched the RESTORE brand of personal lubricants in 2014.  Since that time, Good Clean Love has marketed, shipped and sold hundreds of thousands of units of its RESTORE™ personal lubricants throughout the United States, Canada, and other countries in increasing volumes.

25.    Good Clean Love markets RESTORE lubricants using the distinctive and fanciful RESTORE mark that signifies Good Clean Love and is associated with Good Clean Love's commitment to quality.  It's marketing and packaging for RESTORE also include tear drop artwork that GCL has used since 2014, as well as the familiar leaf artwork displayed on all of Good Clean Love's products, predominantly colored in green, blue, and white.  Together, this leaf and tear drop artwork in green, blue, and white makes up Good Clean Love's distinctive trade dress that consumers associate with Good Clean Love and its RESTORE brand of lubricant.

26.    Good Clean Love owns and controls all intellectual property and confidential information associated with its Intimacy Products.  Good Clean Love's intellectual property includes its RESTORE trademark ("RESTORE Trademark") for lubricants and the associated product packaging and artwork for its RESTORE lubricant ("RESTORE Trade dress").

27.    Good Clean Love owns trademark rights in its RESTORE trademark from its use of the trademark in commerce since 2014, and has applied for a U.S. Trademark Registration application for RESTORE on October 26, 2017 (application attached as Exhibit A).  Attached as Exhibit B are true and correct copies of marketing materials and packaging for Good Clean Love's RESTORE™ brand of products.

28.    Good Clean Love protects its intellectual property rights, including through its agreements with distributors and other third parties.  The Aurium Distribution Agreement, Section 10, expressly protects Good Clean Love's intellectual property rights.

29.    Good Clean Love is also diligent in protecting its trade secrets, which include its manufacturing processes, product formulations, sales methods, consumer profiles, marketing strategies, lists of suppliers and clients, and other competitive information. The Aurium Distribution Agreement, Section 12, expressly protects Good Clean Love from the misuse of confidential information.

**B.  Good Clean Love's Relationship with Defendants Rowland Global, Rowland and Aurium**

30.    In or about October 2014, Wendy Strgar, Good Clean Love's founder met Defendant Edward Rowland at a trade show in New Jersey.   Mr. Rowland claimed that he was an expert in international marketing, distribution, strategic acquisition and regulatory matters for consumer products such as those marketed by Good Clean Love, and claimed he could greatly expand the

sales of Good Clean Love's products in the international markets.  He contacted Ms. Strgar several times by phone and email at Good Clean Love's headquarters in Eugene, Oregon in order to gain Good Clean Love's business.

31.     Based on Mr. Rowland's representations, Good Clean Love entered into an oral agreement with Defendant Rowland Global, whereby Rowland Global and Edward Rowland would facilitate product distribution in Canada and elsewhere (the "Agency Agreement") and assist Good Clean Love with regulatory and strategic acquisition matters.

32.     Rowland provided Good Clean Love with consulting services over six months, frequently contacting Ms. Strgar by phone and email at Good Clean Love's headquarters in Eugene, Oregon to provide consulting services.

33.     Those services were disastrous for Good Clean Love.  Rowland breached every imaginable fiduciary duty and standard of professional conduct and service to Good Clean Love over those six months, leaving the company in much worse position for having retained Rowland's services.

34.     Good Clean Love also protects its confidential information by only disclosing such information subject to non-disclosure agreements with third-party advisers and vendors, including with Rowland at the beginning of its engagement with Good Clean Love.

> **i.    Rowland negotiated and directed Good Clean Love to enter an ill-conceived and highly damaging exclusive distribution agreement with Defendant Aurium**

35.     Rowland introduced Good Clean Love to Defendant Aurium, a distributor with contacts in Canada.  Rowland was significantly involved in negotiations for the exclusive distribution deal between the parties.  Mr. Rowland described himself as "the person at the center of negotiations."

36.     As Good Clean Love's consultant, Rowland had a duty to act in Good Clean Love's interests in connection with negotiations, and to fully disclose any conflicts of interest.

37.    In or about November 2014, Mr. Rowland represented to Good Clean Love that he was acting as a "relentless negotiator" on Good Clean Love's behalf in contract negotiations with Aurium.

38.    On November 25, 2014, Good Clean Love and Aurium entered into the "Distribution Agreement" under which Aurium would act as Good Clean Love's exclusive Canadian distributor, supporting and facilitating the expansion of Good Clean Love's product sales and distribution in drug stores throughout Canada.  A true and correct copy of the Distribution Agreement is attached as Exhibit C.

39.    Rowland acted as Good Clean Love's agent in negotiating with Aurium, and ultimately, in completing the Distribution Agreement between Good Clean Love and Aurium.

40.    In pertinent part, the Distribution Agreement: (i) required Aurium to provide Good Clean Love with certain metrics, plans, goals, and notices related to sales of Good Clean Love's products; (ii) required Aurium to pay for any and all listing fees related to Good Clean Love's products; and (iii) prohibited Aurium from competing with Good Clean Love (or representing a competing brand) during the term of the Distribution Agreement, and for 18 months after that term.

41.    The Distribution Agreement also restricts Aurium from misuse of Good Clean Love's Intellectual Property, Section 10, and Confidential Information, Section 12.  It expressly provides that Aurium would receive no licenses to use Good Clean Love's Intellectual Property.  Aurium was certainly not licensed to use Good Clean Love's branding, intellectual property or trade secrets for distribution of its or others' products.

42.    Although Good Clean Love understood the distribution agreement with Aurium (specifically paragraph 7.1) to provide for Aurium to pay all listing fees in connection with Aurium's distribution efforts, Aurium disputed the meaning of Pargraph 7.1.  Revealing his true

allegiances, Rowland acted in Aurium's interest (adverse to Good Clean Love's interest) by pressuring Good Clean Love to pay listing fees that were Aurium's contractual obligation. Specifically, Rowland emailed both Good Clean Love and Aurium, without prior notice or approval of Good Clean Love, stating: "There has been some questions about Listing Fees and responsibility for paying them . . . as the person at the center of negotiations, I can make a very clear statement about Listing Fee.  GCL is responsible for all listing fees."  Good Clean Love was blindsided by Rowland's email, as it immediately lost all leverage in its listing fee dispute with Aurium, and proceeded to resolve the dispute by paying the listing fees despite the language of the Distribution Agreement.

43.     Further, during the Distribution Agreement term, Aurium was repeatedly late in making payments to Good Clean Love for product purchases for resale in Canada, failed to provide Good Clean Love with required sales and marketing information, and failed to meet its required sales and revenue targets.

44.     Also during the term of the Distribution Agreement, Aurium damaged Good Clean Love's relationship with Canadian retail companies by failing to meet their requirements and rendering subpar services to them.

45.     During the term of the Distribution Agreement, Rowland breached his agency agreement and fiduciary duties to Good Clean Love by acting in the interests of Aurium and adversely to the interests of Good Clean Love, for whom Rowland was obligated to act as agent.

46.     During the term of the Distribution Agreement, Rowland aided Aurium in breaching the Distribution Agreement, including by siding with Aurium on the issue of listing fees, by not requiring Aurium to meets its contractual obligations, and providing Aurium with information that Aurium used in launching a competing RESTORE brand of lubricant.

47.    As a result of Aurium's conduct, Good Clean Love terminated the Distribution Agreement by a letter dated September 13, 2016 (the "Termination Letter").  Attached as Exhibit D is a true and correct copy of the Termination Letter.

48.    Aurium has outstanding debts to Good Clean Love.

49.    As a result of the acts of Defendants, Good Clean Love's relationship and reputation with Canadian retailers, including a prominent Canadian retail chain known as SDM, has been damaged.

### ii. Rowland failed to meet professional standards of service and breached fiduciary duties to Good Clean Love in connection with regulatory and strategic acquisition matters

50.    Rowland represented to Good Clean Love that he was an expert consultant in matters relating to marketing of consumer products, regulatory issues, and strategic acquisitions.

51.    From November 2014 through May 2015, Rowland advised Good Clean Love concerning regulatory issues, including Good Clean Love's at-the-time pending 510K submission to the FDA.

52.    Ed Rowland repeatedly encouraged Good Clean Love to lead its marketing claim with scientific claims prior to completion of Good Clean Love's 510K approval.  This hasty and ill-thought out advice was contrary to his fiduciary duty to advise Good Clean Love consistent with regulatory responsibilities.  Good Clean Love advised Rowland, in response, that until Good Clean Love completed its clinical studies and received FDA approval it could not lead with medical claims.

53.    Further, Rowland took a leading role in negotiations and diligence issues involving potential strategic acquisitions.  Rowland pressured Good Clean Love to enter strategic acquisition negotiations despite being aware that Good Clean Love had not completed its FDA approval process.   In particular, Rowland encouraged strategic acquisition discussions with a large

consumer products company that could have been worth tens of millions of dollars to Good Clean Love.  His motivation and the timing of those discussions were driven by Rowland self-interest in negotiating a finder's fee for himself and not by the best interests of his client Good Clean Love.

54.    In fact, Rowland advised Good Clean Love to hold back information with respect to Good Clean Love's regulatory circumstances and other diligence requests from that same strategic acquirer.  On or about March 30, 2015, he stated:

> We want to show them enough information so that they know GCL is an incredible strategic partner and/or asset for them but not so much that they decide to just do it on their own.

55.    In connection with those same negotiations, the potential acquirer asked diligence questions about Good Clean Love's FDA 510K submissions.  Rowland reviewed Good Clean Love's FDA regulatory materials and, in an email dated on or about April 27, 2015, prepared a draft response for Good Clean Love, stating that Good Clean Love's application for 510K was "on hold" pending a response to several deficiencies.

56.    Once it became clear to Rowland that he could not negotiate his desired finder's fee, he acted against Good Clean Love's interest by attempting to hold up Good Clean Love's negotiations, in order to pressure Good Clean Love to pay Rowland a finder's fee in connection with any strategic acquisition of Good Clean Love.

57.    The acquisition negotiations with the large consumer products company fell through, in part, due to Rowland's negligence and self-interested behavior.  Based on Rowland's own admissions, the same regulatory issues on which Rowland had been advising Good Clean Love, namely Good Clean Love's 510K submission and diligence on that topic, were among the reasons that Good Clean Love's acquisition negotiations failed.  His negligence cost Good Clean Love a multi-million-dollar deal.

### C. Aurium's Launch of a Competing Lubricant using Good Clean Love's RESTORE Brand Name

58.    In or about 2017, almost immediately after Good Clean Love's termination of the exclusive distributor agreement, Aurium (using information from Rowland and with Rowland's knowledge and support) launched a new line of hygiene products and lubricants under the pHemme brand and artwork depicting a leaf and a tear drop using the same green, blue, and white colors.  Notably, Aurium sells a personal lubricant using the RESTORE trademark, in combination with the same leaf and tear drop art work in green, blue, and white that appear on all of its pHemme products.

59.    Aurium's manufacture, offers for sale, import, and sale of this line of intimacy products ("the Accused Products") is confusingly similar to Good Clean Love's Intimacy Products, including particularly the personal lubricant marketed under the RESTORE brand (the Accused Trademark").

60.    Aurium's marketing of its RESTORE lubricant brings to consumers' minds many of elements of Good Clean Love's (it's former client's) products.  Similar to Good Clean Love's Restore lubricant, Aurium's Restore product is a lubricant with an applicator. It also claims, similar to Good Clean Love products, that its RESTORE products are pH balanced.  The likelihood of confusion between the Good Clean Love and Aurium Restore lubricants, marketed with similar leaf and tear drop artwork designs in green, blue, and white, is high.

61.    Aurium is offering its competing pHemme and RESTORE brand for sale through SDM and other Canadian distributors.  Attached as Exhibit E are copies of the Accused Trademark and the Accused Trade Dress.

62.    Aurium is also selling the Accused Products through the Internet, including its own website, which offers to sell and ship the Accused Products throughout the United States and Canada.  See www.pHemme.ca and www.aurium.ca.

63.    Aurium is selling the Accused Products using Good Clean Love's confidential information, obtained through its distribution relationship with Good Clean Love and through Good Clean Love's consultant Rowland.   That use is a breach of the Aurium distribution agreement. Specifically, Aurium's conduct breaches the non-compete agreement, Section 3, intellectual property provisions, Section 10, and confidentiality provisions, Section 12.

### COUNT I – TRADEMARK INFRINGEMENT AND

### FALSE DESIGNATION OF ORIGIN – AURIUM

64.    Good Clean Love incorporates by reference all preceding paragraphs.

65.    This count for trademark infringement arises under the Lanham Trademark Act of July 5, 1946, 15 U.S.C. §§ 1051 et seq. and particularly § 1125(a) thereof.

66.    Good Clean Love owns its RESTORE trademark for personal lubricants, and that trademark is valid and enforceable against Defendants.

67.    Good Clean Love has used its RESTORE™ trademark since as early as 2014.  The RESTORE trademark is arbitrary and distinctive mark that is associated with Good Clean Love's sale of lubricant products.

68.    Aurium's use of the Accused Trademark, starting in or about early 2017, in connection with the marketing and sale of personal lubricants that compete directly with Good Clean Love's RESTORE brand, has been without permission, license, or authority from Good Clean Love.

69.    Aurium markets its RESTORE brand of personal lubricants to the same consumers and through the same channels on the same shelves as does Good Clean Love.

70.     Aurium's advertisements willfully misrepresent its products' source and are likely to cause confusion or a misplaced association with Good Clean Love among pertinent consumers.

71.     Aurium's aforesaid acts were reckless or willful.

72.     Aurium's aforesaid acts constitute trademark infringement and false designation of origin in violation of 15 U.S.C. § 1125(a).

73.     By reason of Aurium's aforesaid acts, Good Clean Love has suffered irreparable harm, and unless Defendant is promptly restrained from continuing its wrongful acts, the irreparable injury that Good Clean Love is suffering will continue.

74.     Good Clean Love has no adequate remedy at law.

## COUNT II – BREACH OF CONTRACT - AURIUM

75.     Good Clean Love incorporates by reference all preceding paragraphs.

76.     This count is for breach of contract against Aurium.

77.     The Distribution Agreement was and is a valid contract.

78.     Aurium breached the Distribution Agreement by at least the acts and omissions detailed in the Termination Letter, and in the allegations above of breach of the Distribution Agreement.

79.     Aurium breached the Distribution Agreement by its unpermitted use of Good Clean Love's intellectual property and by failing to notify Good Clean Love, as required in Section 10.2 of that agreement, that it was infringing Good Clean Love's intellectual property rights.

80.     Aurium also breached the Distribution Agreement by competing with Good Clean Love within 18 months of the agreement's termination, thereby violating at least Section 3.1.

81.     Aurium also breached the misuse of confidential information provisions in Section 12.

82.     Aurium also breached the performance standards and requirements in the Distribution Agreement.

83.    Aurium's acts as alleged above were reckless or willful.

84.    By breaching the Distribution Agreement, Aurium caused damages to Good Clean Love in an amount to be determined at trial, but in excess of $1,000,000.

### COUNT III – INTENTIONAL INTERFERENCE WITH ECONOMIC RELATIONS – ALL DEFENDANTS

85.    Good Clean Love incorporates by reference all preceding paragraphs.

86.    This count is for the common law tort of intentional interference with economic relations.

87.    During the term of the Distribution Agreement, business relationships existed between Good Clean Love and various Canadian retailers, including SDM and others ("the Canadian Business Relationships").

88.    The Canadian Business relationships contained the probability of future benefit to Good Clean Love.

89.    Defendants knew of the Canadian Business relationships.

90.    Defendants, by improper means and for improper purpose, intentionally interfered with the Canadian Business relationships.  Defendants breached their fiduciary duties and contractual obligations to Good Clean Love by persuading retailers to replace Good Clean Love's lubricants and hygiene products with Aurium's lubricants and hygiene products.  Moreover, Defendants' used Good Clean Love's confidential information and misled retailers in shifting distribution to Aurium's products.

91.    By committing the acts alleged above, Defendants caused damages to Good Clean Love in an amount to be determined at trial, but in excess of $1,000,000.

### COUNT IV – UNLAWFUL BUSINESS, TRADE PRACTICES - AURIUM

92.    Good Clean Love incorporates by reference all preceding paragraphs.

93.     This count for unlawful business practice arises under ORS 646.608(1).

94.     Defendants, in the course of their business, made representations to various third parties regarding Good Clean Love, Good Clean Love's line of Intimacy Products, and the Accused Products.

95.     Defendants made deceptive statements regarding the source, association, and origin of the Accused Products and of Good Clean Love's line of Intimacy Products.

96.     Defendants caused a likelihood of confusion and misunderstanding as to the source, approval, sponsorship, affiliation, connection, and/or association of the Accused Products with Good Clean Love.

97.     Aurium's statements were intended to cause confusion as to the source, approval, designation of origin, quality, characteristics, and/or benefits of Good Clean Love's products.

98.     Defendants' statements actually caused such confusion.

99.     Defendants acts as alleged above constituted unlawful business and trade practices in violation of ORS 646.608(1).

100.    Based upon Defendants' acts as alleged above, Good Clean Love has been damaged in an amount to be determined at trial, but in excess of $1,000,000.

**COUNT V – BREACH OF GOOD FAITH AND FAIR DEALING - AURIUM**

101.    Good Clean Love incorporates by reference all preceding paragraphs.

102.    As part of the Distribution Agreement between Aurium and Good Clean Love, the parties owed each other an implied duty of good faith and fair dealing.

103.    Defendant Aurium breached this duty by acting in ways that injured Good Clean Love, including, but not limited to, improperly using confidential information gained during the course of the relationship to sell its own products, misappropriating the intellectual property of Good

Clean Love, and making insufficient effort to meet the goals established in the Distribution Agreement.

104.    Based upon the acts of Aurium, Good Clean Love has suffered significant damages, in an amount to be determines at trial, but in excess of $1,000,000.00.

## COUNT VI – BREACH OF FIDUCIARY DUTY – ROWLAND AND ROWLAND GLOBAL

105.    Good Clean Love incorporates by reference all preceding paragraphs.

106.    Defendants Rowland and Rowland Global, as agents of Good Clean Love, had fiduciary duties to Good Clean Love.

107.    Rowland had a fiduciary duty to act in Good Clean Love's interests and to fully disclose any conflicts of interest.  Rowland told Good Clean Love that he was acting as a "relentless negotiator" on Good Clean Love's behalf in contract negotiations with Aurium.

108.    Good Clean Love understood the exclusive distribution agreement with Aurium, an particular paragraph 7.1, to provide for Aurium to pay all listing fees in connection with Aurium's distribution efforts. Nevertheless, Rowland acted in Aurium's interest (adverse to Good Clean Love's interest) by bullying Good Clean Love to pay listing fees that were Aurium's contractual obligation.  Specifically, Rowland emailed both Good Clean Love and Aurium, without prior notice or approval of Good Clean Love, stating: "There has been some questions about Listing Fees and responsibility for paying them . . . as the person at the center of negotiations, I can make a very clear statement about Listing Fee.  GCL is responsible for all listing fees."

109.    Rowland's statement about listing Fees was adverse to Good Clean Love's interests, and breached Rowland's fiduciary duties, costing Good Clean Love tens of thousands of dollars.

110.    Rowland continued to favor Aurium's interests over Good Clean Love's. Both before and after Rowland's consulting agreement with Good Clean Love, Rowland shared proprietary and confidential information of Good Clean Love with Aurium and conspired with Aurium to develop strategies against Good Clean Love's interests.

111.    In or about September and October 2016, when Good Clean Love took steps to terminate its relationship with Aurium, Aurium forwarded Good Clean Love's communications to Mr. Rowland's brother and Rowland Global's counsel, Stephen Rowland, and Stephen Rowland engaged in information exchange with Aurium, on Rowland's behalf, contrary to Good Clean Love's interests.  Those communications were a breach of Rowland's ongoing fiduciary duties to Good Clean Love.

112.    By breaching their fiduciary duty to Good Clean Love, Rowland caused Good Clean Love damages in an amount to be determined at trial, but in excess of $1,000,000.

## COUNT VII - PROFESSIONAL NEGLIGENCE – ROWLAND AND ROWLAND GLOBAL

113.    Good Clean Love incorporates by reference all preceding paragraphs.

114.    Defendants Rowland and Rowland Global, as agents of Good Clean Love, had a professional duty of care to represent the interests of Good Clean Love.

115.    Rowland is a professional consultant, who had a duty to care to professionally and competently advise Good Clean Love in connection with its regulatory and acquisition matters, without conflict of interest.

116.    On the Rowland Global website, Rowland claims that "We bring clarity and direction and deliver extraordinary results. Not everyone has the business insight and focus it takes to drive

teams and organizational performance across vastly different cultures and business environments. You can leverage 30+ years in the global business world to create lasting success."

117.    Because he holds himself out as having special skills and that he is highly sophisticated and accomplished international consultant, he owed Good Clean Love a heightened standard of care.

118.    Rowland advised Good Clean Love in connection with regulatory matters and specifically in connection with Good Clean Love's FDA 510K submission.

119.    Rowland also advised Good Clean Love in connection with an acquisition by a larger consumer products company that could have been worth tens of millions of dollars to Good Clean Love.

120.    Rowland advised Good Clean Love to hold back information relating to Good Clean Love's regulatory circumstances from the potential acquirer, and took steps to hold up Good Clean Love's acquisition until Rowland achieved a finder's fee agreement with Good Clean Love. Rowland's own self-interest and negligent consulting advise scuttled Good Clean Love's efforts to close on its acquisition deal.

121.    These actions fell well below the standard of care and lead to significant loses to Good Clean Love.

122.    By breaching the standard of care owed to Good Clean Love, Rowland caused Good Clean Love damages in an amount to be determined at trial, but in excess of $10,000,000.

        **WHEREFORE**, Plaintiff prays that:

a)      Defendants be found to have committed trademark infringement and false designation of origin under 15 U.S.C. § 1125(a) by their unauthorized use of Good Clean Love's RESTORE™ trademark;

b)      Defendants be found to have committed false representation under 15 U.S.C. § 1125(a) by their unauthorized use of Good Clean Love's RESTORE™ trademark;

c)      Defendants be found to have willfully committed the above alleged acts in violation of the Lanham Act;

d)      Good Clean Love be awarded compensatory and enhanced damages for Defendant's willful Lanham Act violations;

e)      Defendants be preliminarily and permanently enjoined from committing trademark infringement, false designation of origin and false description or representation with respect to Good Clean Love's trademarks;

f)      Good Clean Love be awarded its attorneys' fees and costs for Defendant's Lanham Act violations;

g)      Defendant Aurium be found to have breached its contract with Good Clean Love;

h)      Defendants be found to have intentionally interfered with Good Clean Love's economic relations;

i)      Defendants be found, by their unlawful business and trade practices, to have violated ORS 646.608(1);

j)      Good Clean Love be awarded compensatory damages to make it whole for Defendant Aurium's breach of the Distribution Agreement;

k)      Good Clean Love be awarded compensatory damages to make it whole for Defendants' tortious interference with Good Clean Love's economic relations and Defendants' unlawful business and trade practices;

l)      Defendants be preliminarily and permanently enjoined from interference with Good Clean Love's economic relations;

m)      Defendants Rowland Global and Edward Rowland be found to have breached their fiduciary duty to Good Clean Love;

n)      Good Clean Love be awarded compensatory damages to make it whole for the breaches by Defendant Rowland Global and Edward Rowland of their fiduciary duty;

o)      Good Clean Love be awarded compensatory damages to make it whole for the breaches by Defendant Rowland Global and Edward Rowland of the duties of good faith and fair dealing;

p)      Defendants Rowland Global and Edward Rowland be found to have been professionally negligent;

q)      Good Clean Love be awarded compensatory damages to make it whole for Rowland Global and Edward Rowland's professional negligence; and

r)      Good Clean Love be granted such other relief as the Court may deem just and proper.

/ / /

/ / /

/ / /

## JURY DEMAND

Good Clean Love demands a trial by jury on all issues properly tried before a jury.

DATED this 26th day of October, 2017.

Respectfully submitted,

KOLISCH HARTWELL, P.C.

By ___s/ David P. Cooper_____
    David P. Cooper, OSB No. 880367
    E-mail: cooper@khpatent.com
    Owen W. Dukelow, OSB No. 965318
    E-mail: owen@khpatent.com
    Desmond J. Kidney, II, OSB No. 131558
    E-mail: desmond@khpatent.com
    520 S.W. Yamhill Street, Suite 200
    Portland, Oregon  97204
    Telephone: (503) 224-6655
    Facsimile: (503) 295-6679

*Of Attorneys for Plaintiff*
*Good Clean Love, Inc.*